UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AHMED K. NASSER,

               Plaintiff,                  Civil Action No. 2:12-cv-12151

       v.                          District Judge Paul D. Borman
                                 Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

               Defendant.
_____/

## REPORT AND RECOMMENDATION TO
## GRANT IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [9] AND
## DENY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [14]

Plaintiff Ahmed K. Nasser began working as a seaman in 1994. (Tr. 36.) In June 2008, while working on a ship's platform, he fell three feet and hit a "steel point" extending from one of the ship's walls. (Tr. 403; *see also* Tr. 235.) Nasser's injuries have resulted in long-term low-back pain and leg numbness. (*See* Tr. 403; *see also* Tr. 235.) Not long after the fall, Nasser applied for disability insurance benefits and supplemental security income. (Tr. 11.) The Defendant Commissioner of Social Security denied Nasser's applications. (*See* Tr. 1.)

Nasser now appeals that denial. (*See* Dkt. 1, Compl.; Tr. 11.) Before the Court for a report and recommendation (Dkt. 3) are the parties' cross-motions for summary judgment (Dkts. 9, 14). For the reasons set forth below, this Court finds that the Administrative Law Judge did not fully comply with the explanatory requirement of the treating-physician rule. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 9) be GRANTED IN PART, that Defendant's Motion for Summary Judgment (Dkt. 14) be DENIED, and that, pursuant to 42

U.S.C. § 405(g), the decision of the Commissioner of Social Security be REMANDED.

## I. BACKGROUND

### A. Procedural History

On August 21, 2008, Nasser applied for disability insurance benefits ("DIB") and supplemental security income ("SSI") asserting that he became unable to work on June 8, 2008. (Tr. 11.) The Social Security Administration initially denied Nasser's disability applications in October 2008. (*Id.*) Nasser then requested an administrative hearing, and on August 26, 2010, he appeared with counsel before Administrative Law Judge ("ALJ") John J. Rabaut, who considered his case *de novo*. (*See* Tr. 27-63.) In an October 20, 2010 decision, the ALJ found that Nasser was not disabled. (*See* Tr. 11-21.) The ALJ's decision became the final decision of the Commissioner of Social Security ("Commissioner") on April 20, 2012 when the Social Security Administration's Appeals Council denied Nasser's request for review. (Tr. 1.) Nasser filed this suit on May 14, 2012. (Dkt. 1, Compl.)

### B. Medical Evidence

On June 8, 2007, Nasser was admitted to the hospital for injuries sustained in his fall. (Tr. 227.) An MRI taken six days later revealed mild central canal stenosis at L3-L4 and moderate central canal stenosis at L4-L5. (Tr. 229.)[1]

---

[1] The spinal column is comprised of vertebrae separated by discs that act as cushions between the vertebrae. *See* The Cleveland Clinic, *Lumbar Canal Stenosis*, http://my.clevelandclinic.org/disorders/stenosis_spinal/hic_lumbar_canal_stenosis.aspx (last visited March 29, 2013). The spinal cord runs through the middle of the vertebral column. *See id.* "At each disc level, a pair of spinal nerves exits and passes into the arms and legs." *Id.* Facet joints are located bilaterally at each vertebral level. Andrew L. Chen, MD and Jeffrey M. Spivak, MD, *Degenerative Lumbar Spinal Stenosis*, 31 The Physician and Sports Medicine 8 (Aug. 2003). "Degenerative enlargement of the facet joints may result in central impingement on the spinal canal (central stenosis) or more laterally, where the nerve root moves toward the foramen (lateral recess stenosis). Narrowing of the neural

Not long after his accident, Nasser began a lengthy course of treatment with three physicians at the Michigan Head & Spine Institute ("MHSI"): Dr. Fernando Diaz, Dr. Sophia Grias, and Dr. Henry Tong.  In June 2007, Nasser reported to Dr. Diaz that his lower-back pain radiated into both legs.  (Tr. 403.)  Dr. Diaz believed that Nasser had L5-S1 radiculopathy.  (Tr. 405.)  He recommended imaging studies and an EMG.  (*Id.*)  The EMG confirmed mild L5 radiculopathy.  (Tr. 425.)

In July 2007, Nasser had the first of many visits with Dr. Grias — the MHSI physician who treated Nasser most often.  (Tr. 398-401.)  Nasser told Dr. Grias that while Motrin and Flexeril helped, he was still in constant pain.  (Tr. 398.)  Dr. Grias diagnosed Nasser with stenosis and radiculopathy.  (Tr. 399.)  She started Nasser on physical therapy.  (*Id.*)

The next month, Dr. Grias noted that physical therapy had not significantly improved Nasser's pain.  (Tr. 395.)  Nasser reported being able to walk for only five minutes before severe pain set in.  (Tr. 395.)  Dr. Grias altered Nasser's pain medications and provided that Nasser should follow up with Dr. Diaz.  (Tr. 396.)  At the follow-up, Dr. Diaz noted that Nasser would benefit from back surgery.  (Tr. 393.)

Later in August 2007, Nasser returned to Dr. Grias.  (Tr. 384-86.)  Nasser wanted to hold off on surgery.  (Tr. 385.)  He was then taking Vicoprofen, Lyrica, and Flexeril.  (*Id.*)  Dr. Grias referred Nasser to Dr. Tong at MHSI for a steroid injection.  (Tr. 385; *see also* Tr. 378-79, 380-83.)

In October 2007, Nasser reported to Dr. Grias that his right-leg pain had improved slightly following the injection, but his back pain had seemed to increase.  (Tr. 375.)  Dr. Grias noted that since conservative treatment had failed, Nasser should return to Dr. Diaz for a surgical

foramen may compress the exiting nerve root (foraminal stenosis)."  *Id.*

recommendation.  (Tr. 376.)  A few days later, Dr. Tong appeared to agree that continued conservative treatment would not be effective: "since [Mr. Nasser] got no relief with [the] right L4-S1 . . . epidural steroid injection, I would not repeat it."  (Tr. 372.)

On November 21, 2007, Nasser underwent lower-back surgery. (Tr. 242-50.)  In particular, Dr. Diaz performed a lumbar laminectomy, medial facetectomy, and foraminotomy with diskectomy at L4-L5.  (*Id.*)  At a December 2007 follow-up, Nasser told Dr. Diaz that his radicular symptoms had resolved and that he had only minor residual discomfort in his right buttock.  (Tr. 361.)

In January 2008, Dr. Diaz opined that Nasser had done well since his surgery.  (Tr. 359.)  He made arrangements for Nasser to see Dr. Grias for pain management and noted that she would decide when Nasser could return to work.  (Tr. 359.)

When Nasser returned to Dr. Grias, she noted, "[h]e does not have much pain in his back.  The pain radiating down his left leg has resolved totally.  The pain in the right leg is about the same and will go all the way down the lateral part of his leg."  (Tr. 356.)  Dr. Grias restarted Nasser on physical therapy.  (*Id.*)

In February 2008, Nasser reported that while physical therapy had helped some, he still had back pain that intermittently radiated into the bottom of his right foot.  (Tr. 353.)  Dr. Grias started Nasser on Elavil for neuropathic pain.  (Tr. 354.)

The next month, Nasser told Dr. Grias that physical therapy had increased his symptoms.  (Tr. 350.)  Tingling had returned to the left leg and Dr. Grias noted, "[t]he pain on [his] right side has continued since [the] surgery with no significant improvement."  (*Id.*)  Nasser, however, was able to perform "basic" and "light advanced" activities of daily living.  (*Id.*)  (Nasser's wife and children helped with the "heavier advanced" activities.  (*Id.*))  On exam, Dr. Grias found that

4

Nasser's sacroiliac joint and right sciatic notch were tender. (Tr. 351.) Nasser also had a decreased range of motion and pain "at the extremes of flexion and extension." (*Id.*) Dr. Grias ordered a new MRI and EMG. (*Id.*)

An April 2008 MRI showed "mild underlying congenital narrowing of the spinal canal at L3-L4 and at L4-L5." (Tr. 252.) It also revealed "relatively extensive enhancing tissue along the right lateral and anterior aspect of the thecal sac and in the right lateral recess consistent with scar tissue." (*Id.*) The imaging-study report also noted "[m]ild bulging of the disc at L4-L5." (*Id.*) A contemporaneous EMG revealed right L5 radiculopathy. (Tr. 418.)

Later in April 2008, Dr. Grias reviewed the test results. (Tr. 347.) She noted that the images showed "a 2-mm bulge at L4-L5," "scar tissue," and "facet hypertrophy at L3-L4 and L4-L5." (*Id.*) According to Dr. Grias, the EMG showed "chronic L5 radiculopathy on the right," but "no new changes." (*Id.*) On exam, Nasser exhibited a good range of motion in his lower extremities along with 5-out-of-5 strength. (Tr. 348.) Nasser had less sensation in his right-leg L5 distribution than in his left. (*Id.*) Dr. Grias started Nasser on Neurontin and continued Vicodin for "breakthrough" pain. (*Id.*) Nasser was directed to follow up with Dr. Tong if he desired injections. (*Id.*)

In May 2008, Nasser told Dr. Grias that physical therapy, which he had been participating in since February 2008 (Tr. 253-80), had not been effective. (*See* Tr. 344.) Dr. Grias noted that Nasser had "plateaued" in physical therapy. (Tr. 345.) Dr. Grias provided that Nasser would undergo "a functional capacity evaluation to determine his restrictions." (*Id.*)

On June 26, 2008, Todd Holland, a physical therapist, completed the functional capacity evaluation ordered by Dr. Grias. (Tr. 299-3111.) Holland found that Nasser could lift 19 pounds occasionally and 13 pounds frequently between waist and shoulder level, but that Nasser had no

lifting capacity between floor and waist level. (Tr. 300.) He also provided that Nasser could carry

16 pounds on an occasional basis and nine pounds on a frequent basis. (*Id.*) Holland found that

Nasser's standing and/or walking was limited to 15-30 minute intervals. (*Id.*) Holland concluded

that Nasser "should" be able to work at the "light" demand level. (*Id.*) Holland apparently hesitated

because of Nasser's "guarding" during the evaluation:

> The preponderance of evidence in the [Functional Capacity
> Evaluation] indicates [that Mr. Nasser] did not appear to participate
> fully in testing. [The] Performance Criteria Profile is consistent with
> [o]ver-guarding (fearful subject). Demonstrated impairment is
> difficult to accurately determine due to low effort demonstrated in
> testing overall.

(Tr. 300.)

The same day, June 26, 2008, Dr. Grias evaluated Nasser. (Tr. 341-42.) She remarked on

Holland's evaluation as follows: "He was in the light work demand level, although he was fearful

during his examination." (Tr. 341.) She then offered this opinion:

> He is at [maximum medical improvement] with restrictions of no
> repetitive lifting, pushing, or pulling greater than 15 pounds, and
> limited bending and squatting with a [sit-stand] option. This puts him
> in a light physical demand level. At this time, he is unable to return
> to his prior position.

(Tr. 342.)

When Nasser returned to Dr. Grias in July 2008, he reported that his back pain had worsened

on the right side and radiated down to his feet with numbness and tingling. (Tr. 338.) Nasser told

Dr. Grias that the pain worsened when he lifted or bent over. (*Id.*) Dr. Grias maintained that Nasser

could not return to his "prior [work] position at this time," and ordered a short course of physical

therapy. (Tr. 339.) She also directed a follow-up with Dr. Diaz. (*Id.*)

In August 2008, Dr. Diaz provided that Nasser's radicular symptoms had completely

resolved on the right, but that Nasser still had pain on the left that radiated down through his left leg. (Tr. 335.)  Dr. Diaz opined, "I believe Mr. Nasser has had resolution of his radicular symptoms. There is no sign of residual disc herniation in the lumbar spine." (Tr. 336.)  Dr. Diaz believed that Nasser should see Dr. Tong for pain management.  (*Id.*)

Nasser saw Dr. Tong about two weeks later.  (Tr. 331-34.)  Dr. Tong reviewed Nasser's MRIs and EMGs and examined Nasser.  (Tr. 332.)  He found that Nasser's lower back was "mildly" tender.  (*Id.*)  Dr. Tong's impression was "central broad L4-5 disc herniation with annular tear with 4mm central canal[] stenosis, L4-5 biforaminal stenosis, and bilateral L5 radiculopathies [status post surgery] with much epidural fibrosis at the right L4-5 region surrounding the right L4-S1 nerve root." (Tr. 333.)  He reasoned that Nasser might be able to benefit from spinal injections or a spinal cord stimulator.  (Tr. 333.)

In September 2008, Nasser returned to Dr. Grias.  (Tr. 328-30.)  He reported, according to Dr. Grias, that he was still having "a lot" of pain.  (Tr. 328.)  Nasser told Dr. Grias that his back pain prevented him from lifting his 15-pound baby.  (*Id.*)  Dr. Grias wanted Nasser to restart physical therapy, but noted insurance limitations.  (Tr. 329.)  Dr. Grias increased Nasser's Neurontin dosage and continued Nasser on Motrin and Vicodin.  (*Id.*)

Nasser next saw Dr. Grias in January 2009.  (Tr. 326.)  Nasser reported that with the cold weather, he had become very stiff.  (*Id.*)  He told Dr. Grias that he could walk for only about five minutes before his pain caused him to stop and rest.  (*Id.*)  Dr. Grias' exam findings were largely consistent with those from at least nine months earlier: Nasser had a good range of motion in his lower extremities with 5/5 strength and less sensation in his right-leg L5 distribution than in his left. (Tr. 327.)  Dr. Grias opined,

7

> At this time, I believe Mr. Nasser will be left with permanent disability from his injuries to his low back. He would be unable to work productively. At this time, he is permanently disabled. He should not lift, push, or pull greater than 10 [pounds]. He should avoid any repetitive bending, twisting, or prolonged standing or walking. He requires [the option to] sit, stand, or lie down as needed.

(Tr. 327.)

The record reflects that Nasser next sought treatment about nine months later, in September 2009. (Tr. 428-29.) Nasser saw Dr. Nabil Suliman, a fourth MHSI physician. (Tr. 429.) Dr. Suliman noted, "[s]ince [Mr. Nasser's] symptoms [have] worsened, we will repeat imaging and electrodiagnostic studies, and discuss any other surgical options with Dr. Diaz." (Tr. 429.)

In December 2009, Nasser had another visit with Dr. Grias. (Tr. 442-44.) Nasser reported receiving a shot at the emergency room for his back pain. (Tr. 442.) Dr. Grias reviewed the new EMG and MRI studies. (Tr. 443; *see also* Tr. 426-27; 432-33.) She provided that the EMG showed right L4-L5 radiculopathy. (Tr. 443.) Dr. Grias further explained,

> An MRI show[s] annual bulging at [the] L4 level with significant mutlifactorial canal stenosis. He has overgrowth of the hemilaminectomy site. And soft tissue enhancement seen at the L4 level on the right consistent with scarring into the epidural space and into the right lateral recess.

(Tr. 443.) Dr. Grias modified Nasser's medications by prescribing Celebrex. (*Id.*)

A couple months later, however, Dr. Grias remarked, "[t]he Celebrex did not help [Mr. Nasser's] pain, so he will take the Vicodin for pain along with the Neurontin and Robaxin as a muscle relaxant." (Tr. 446.)

In August 2010, Dr. Suliman opined that Nasser was "disabled":

> To Whom it May Concern:

> Mr. Nasser is under my care and is treated for chronic low back pain

8

> and lumbar radiculopathy.  He is also treated for gastritis, headache, and depression.
>
> He is currently disabled and unable to do any job. . . .

(Tr. 448.)

The last treatment note in the administrative record is from August 2010.  (Tr. 449-50.)  Dr. Grias stated that an injection provided at the prior appointment had "helped for a little bit, but [Mr. Nasser's] pain returned and it feels even like it is worsening."  (Tr. 449.)  She noted that Nasser's pain radiated down both legs, and was constant on the right, intermittent on the left.  (Tr. 449.)  Dr. Grias opined, "[a]t this time, I do not believe that [Mr. Nasser] will be able to work in any gainful employment with his constant low back pain.  He does have physical restrictions secondary to the back pain, but also is on . . . strong narcotic medications, which can cloud his mental judgment."  (Tr. 450.)

### C.  Testimony at the Hearing Before the ALJ

#### 1.  Nasser's Testimony

At the administrative hearing before ALJ Rabaut, Nasser primarily testified to his pain.  (*See* Tr. 38-39.)  He explained that he had "a lot of pain" that prevented him from doing much of anything.  (Tr. 38.)  Nasser testified that walking, sleeping, standing, and twisting all caused a large amount of pain.  (Tr. 39.)  Nasser told the ALJ that his pain stayed between a "9" and a "7" on a one-to-ten scale.  (Tr. 40.)  Nasser testified that lying down provided some relief.  (Tr. 40.)  His pain also interrupted his sleep.  (Tr. 43.)

In terms of functional capacity, Nasser testified that he watched TV and did not do much else.  (Tr. 45-46.)  He stated that he did not participate in any hobbies, and that he only occasionally visited his elderly mother.  (Tr. 46-47.)  Nasser told ALJ Rabaut that he could sit for 25 minutes,

stand for two or three minutes, and walk for about five minutes.  (Tr. 47-48.)  Nasser provided that

he used a cane when standing or walking.  (Tr. 51-52.)  In terms of lifting, he testified to being

unable to lift even a gallon of milk.  (Tr. 49.)

### 2. The Vocational Expert's Testimony

The ALJ solicited testimony from a vocational expert ("VE") to determine whether jobs

would be available for someone with functional limitations intended to approximate Nasser's.

The ALJ asked about job availability for a hypothetical individual of Nasser's age (36),

education (eleventh grade), and work experience who was capable of performing work at the

sedentary level with a sit-stand option, but could not climb ladders, ropes, or scaffolds; could not

crawl; could only occasionally climb ramps or stairs; could only occasionally balance, stoop, crouch,

or kneel; needed to use a "handheld assistive device" for prolonged walking or walking over uneven

terrain, but could use the other arm to "carry objects up to the exertional limitation"; had to avoid

moving machinery and unprotected heights; and could not do more than simple, routine, repetitive

tasks performed in a work environment free of fast-paced production with only simple work-related

decisions and few, if any, workplace changes.  (Tr. 55-56.)

The VE testified that there would be jobs that the hypothetical individual could perform.  In

particular, the VE said that the hypothetical individual could work as a surveillance system monitor,

"various sorter positions," and "various inspector positions." (Tr. 57-58.) The VE further provided

that, in southeastern Michigan, there were approximately 500, 1,000, and 1,000 such jobs,

respectively.  (Tr. 58.)

10

## II. THE ALJ'S APPLICATION OF THE DISABILITY FRAMEWORK

Under the Social Security Act (the "Act"), Disability Insurance Benefits (for qualifying wage earners who become disabled prior to expiration of their insured status) and Supplemental Security Income "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Social Security regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the

11

analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

At step one, ALJ Rabaut found that Nasser had not engaged in substantial gainful activity since the alleged disability onset date of June 8, 2007. (Tr. 13.) At step two, he found that Nasser had the following severe impairment: L4 radiculopathy status post L4-5 laminectomy and discectomy. (*Id.*) Next, the ALJ concluded that this impairment did not meet or medically equal a listed impairment. (Tr. 14.) Between steps three and four, the ALJ determined that Nasser had the residual functional capacity to perform

> sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) and requires a sit/stand at will option; cannot climb ladders, ropes, or scaffolds; can occasionally climb ramps or stairs, balance, stoop, crouch, kneel, but no crawling; work would be limited to jobs that could be preformed while utilizing a handheld assistive device for prolonged ambulation or uneven terrain; the contralateral upper extremity could be used to carry objects up to the exertional limitation; must avoid all use of moving machinery; must avoid all exposure to unprotected heights; and work would be limited to simple, routine, and repetitive tasks, performed in a work environment free of fast-paced production, involving only simple work-related decisions, with few, if any, workplace changes.

(Tr. 15.) At step four, the ALJ found that Nasser did not have any past relevant work. (Tr. 19.) At step five, the ALJ found that sufficient jobs existed in the national economy for someone of Nasser's age, education, work experience, and residual functional capacity. (Tr. 19.) The ALJ therefore concluded that Nasser was not disabled as defined by the Social Security Act from the alleged onset date through the date of the decision, October 20, 2010. (Tr. 20.)

### III.  STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."  *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole.  *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council."  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir.

2001).  There is no requirement, however, that either the ALJ or this Court discuss every piece of

evidence in the administrative record.  *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th

Cir. 2006).   Further, this Court does "not try the case de novo, resolve conflicts in evidence, or

decide questions of credibility."  *Bass*, 499 F.3d at 509;  *Rogers*, 486 F.3d at 247.

## IV.  ANALYSIS

Plaintiff primarily claims that the ALJ erred in discounting Dr. Grias' opinions.  (*See* Pl.'s

Mot. Summ. J. at 8-14.)  ALJ Rabaut assigned Dr. Grias' opinions "limited weight."  (Tr. 18.)  He

did so because he believed that they were "internally inconsistent and . . . not based upon objective

evidence."  (*Id.*)  More specifically, the ALJ pointed out that Dr. Grias' June 2008 and January 2009

opinions differed, but Plaintiff's subjective complaints were the only explanation for her change in

opinion:

> On June 26, 2008, Dr. Grias opined that the claimant had reached
> maximum medical improvement and he was capable of exertion at
> the light physical demand level. On January 15, 2009, Dr. Grias
> indicated the claimant was still independent with light ADLs, and had
> 5/5 strength in his lower extremities, but she then opined that the
> claimant was permanently disabled. This was not based upon new
> medical scans or tests, but seems to be based upon subjective reports
> such as the claimant's reports that he could not lift his new 15-pound
> baby.

(Tr. 18.)   The ALJ also reasoned that while later "scans showed additional mild underlying

congenital narrowing, and an EMG showed radiculopathy," these were not "disabling reports."  (*Id.*)

Plaintiff argues that this analysis was error and "submit[s] that Dr. Grias['] opinion was entitled to

controlling weight."  (Pl.'s Mot. Summ. J. at 11.)

The Court disagrees.  As an initial matter, the ALJ did not owe any special deference to her

opinions on the ultimate issue of disability.  (*E.g.*, Tr. 450.)  Dr. Grias, while a medical expert, was

14

not a vocational or legal expert, and the regulations therefore reasonably reserve the ultimate disability determination to the ALJ. *See Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488 (6th Cir. 2010) ("[W]hen a treating physician submits a medical opinion, the ALJ must either defer to the opinion or provide 'good reason' for refusing to defer to the opinion. . . . When a treating physician instead submits an opinion on an issue reserved to the Commissioner—such as whether the claimant is 'disabled' or 'unable to work'—the opinion is not entitled to any particular weight."); *Brock v. Comm'r of Soc. Sec.*, 368 F. App'x 622, 625 (6th Cir. 2010) (holding that ALJ correctly disregarded treating physician's statement that claimant was "100% disabled" because the regulations reserve this determination for the Commissioner, and noting that the regulations further state "that no 'special significance' will be given to opinions of disability, even those made by the treating physician" (quoting 20 C.F.R. § 404.1527(e)(1), (e)(3))).

Second, Dr. Grias' June 2008 opinion is not inconsistent with the ALJ's residual functional capacity assessment.  At that time, she opined:

> [Mr. Nasser] is at [maximum medical improvement] with restrictions of no repetitive lifting, pushing, or pulling greater than 15 pounds, and limited bending and squatting with a [sit-stand] option.  This puts him in a light physical demand level.  At this time, he is unable to return to his prior position.

(Tr. 342.)  In relevant part, the ALJ limited Plaintiff to "sedentary" work, which, consistent with Dr. Grias' June 2008 opinion, has a lifting requirement of only ten pounds.  *See* 20 C.F.R. § 404.1567(a).  The ALJ further limited Nasser to only occasional stooping, crouching, and kneeling — again consistent with Dr. Grias' opinion.  (Tr. 15.)  He also, like Dr. Grias, included a sit-stand option.  (Tr. 15.)  Thus, even assuming that the ALJ erred in failing to give controlling weight to Dr. Grias' June 2008 opinion, Plaintiff has not demonstrated that the error had any adverse impact on

the ultimate disability determination.

This leaves Dr. Grias' January 2009 opinion. There, she opined that Plaintiff was "unable to work productively," was "permanent[ly] disabled," and required the option to sit, stand, and — most importantly — "lie down as needed." (Tr. 327.) It is not contested that at least this last requirement is inconsistent with the ALJ's RFC. And while the Court is also fairly certain that it is work preclusive, at a minimum, the VE did not testify that there would be jobs for someone with such a restrictive limitation. Thus, unlike Plaintiff's claim about Dr. Grias' June 2008 opinion, his claim that Dr. Grias' January 2009 opinion is entitled to "controlling weight" (*see* Pl.'s Mot. Summ. J. at 11), if correct, would affect the disability determination.

Under the treating source rule, an ALJ must generally defer to the opinions of physicians who have treated a claimant over time as opposed to those who have seen the claimant only once or, in the case of a file-review opinion, not at all. *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010); *see also* 20 C.F.R. § 404.1527; S.S.R. 96-2p, 1996 WL 374188. But an ALJ is required to give a treating-source opinion *controlling* weight only when the opinion is "'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in [the] case record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting former 20 C.F.R. § 404.1527(d)(2) now § 404.1527(c)(2)).

Here, as argued by the Commissioner (Def.'s Mot. Summ. J. at 11), substantial evidence supports the ALJ's decision to give less than controlling weight to Dr. Grias' January 2009 opinion. In particular, the ALJ rightly noted that there were no new objective tests performed between Dr. Grias' June 2008 opinion and her opinion that followed six months later. And, based on this Court's

16

review of her treatment notes, her "physical examination" findings were largely the same at the time of her two opinions. (*Compare* Tr. 342 (June 2008) *with* Tr. 327 (January 2009); *see also* Tr. 348 (April 2008).) Thus, the ALJ concluded that the primary, if not only, reason Dr. Grias changed her opinion in January 2009 was because of Plaintiff's interim self-reporting. This was not unreasonable: an ALJ may permissibly discount an opinion based primarily on a claimant's subjective complaints. *See Stiltner v. Comm'r of Soc. Sec.*, 244 F. App'x 685, 689 (6th Cir. 2007) (affirming ALJ's assignment of "little weight" to a treating-source opinion where, among other things, the "[treating source] received no new test results during the intervening eight months but did consult with [Plaintiff] twice. As such, as the ALJ noted, [the treating source's] opinion that [Plaintiff] was disabled 'was based primarily on the claimant's subjective symptoms and not objective data.'"); *Bell v. Barnhart*, 148 F. App'x 277, 285 (6th Cir. 2005) ("There is no indication that Dr. McFadden's opinion was supported by anything other than Bell's self-reports of his symptoms. Such reports alone cannot support a finding of impairment.").

But resolving the controlling-weight inquiry does not end the treating-source analysis. Precedent dictates that Dr. Grias' opinion was still entitled to "great deference" unless the ALJ provided good reasons for not deferring. *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009) ("Even if the treating physician's opinion is not given controlling weight, 'there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference.'" (quoting *Rogers*, 486 F.3d at 242)); *see also* S.S.R. 96-2p, 1996 WL 374188, at *4 ("Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not

17

entitled to 'controlling weight,' not that the opinion should be rejected."). This good-reason requirement, a substantial right on its own, *see, e.g.*, *Wilson*, 378 F.3d at 544; *Rogers*, 486 F.3d at 243, requires an ALJ to show that he considered the following non-exhaustive list of factors: (1) "the length of the treatment relationship and the frequency of examination," (2) "the nature and extent of the treatment relationship," (3) the relevant evidence presented by a treating physician to support his opinion, (4) "consistency of the opinion with the record as a whole," and (5) "the specialization of the treating source." 20 C.F.R. § 404.1527.

The ALJ's narrative does not make plain that he considered these factors. The ALJ did not explain how he accounted for Dr. Grias' three-year relationship with Plaintiff. *See* 20 C.F.R. § 404.1527(c)(2)(i). Nor did he say anything about Dr. Grias' numerous evaluations — at least 16 — during this period. *See* 20 C.F.R. § 404.1527(c)(2)(i); (Tr. 326, 328, 338, 341, 344, 347, 350, 353, 356, 375, 384, 395, 398, 442, 446, 450). Nor did the ALJ discuss the weight he accorded to the extent of the treating-relationship: Dr. Grias reviewed all (or virtually all) of the objective evidence and was privy to the findings of all (or virtually all) of the other MHSI physicians who evaluated Plaintiff. *See* 20 C.F.R. § 404.1527(c)(2)(ii). Nor is it clear how the ALJ accounted for Dr. Grias' employment at a medical facility specializing in back treatment or her specialization in physiatry. *See* 20 C.F.R. § 404.1527(c)(2)(5); Am. Academy of Physical Med. and Rehab. Website, *What is a Physiatrist*, http://www.aapmr.org/patients/aboutpmr/pages/physiatrist.aspx (visited Mar. 29, 2013) ("Physiatrists, or rehabilitation physicians, are nerve, muscle, and bone experts who treat injuries or illnesses that affect how you move."). Moreover, Dr. Grias was familiar with Plaintiff's limited response to various treatments: several pain medications, steroid injections, a TENS unit, and multiple attempts at physical therapy. *See* 20 C.F.R. § 404.1527(c)(2)(5), (c)(2)(6). Further

18

still, Holland, as a physical therapist, was not an "acceptable medical source," and so Dr. Grias'

January 2009 opinion is not contradicted by any other "medical" opinion. *See* S.S.R. 06-03p, 2006

WL 2329939, at *2; *see also Horn v. Astrue*, No. 1:10-CV-253, 2011 WL 4060769, at *11 (E.D.

Tenn. Aug. 15, 2011) *report and recommendation adopted*, 2011 WL 4060698 (E.D. Tenn. Sept.

6, 2011) (finding an absence of substantial evidence to support ALJ's RFC; explaining, "The record

in this case contains no evaluation by any non-examining State Agency Physician and no assessment

of what exertional limitations Plaintiff has.  No Consultative Physician was obtained to assess

Plaintiff's physical limitations.  The treating physician, Dr. Nester, opines Plaintiff is severely

restricted to such an extent he is incapable of any work.").  In fact,  although conclusory, the only

other opinion by an "acceptable medical source" supports Dr. Grias' opinion: Dr. Suliman similarly

opined that Plaintiff was "currently disabled and unable to do any job."  (Tr. 448.)  Even further, it

is not as though Dr. Grias' January 2009 opinion is based solely on Plaintiff's subjective reporting.

EMGs and MRIs pre- and post-dating her January 2009 opinion reveal radiculopathy and at least

some constriction of the spinal canal or neural foramina.  (Tr. 252, 333, 418, 426-27, 432-33, 443.)

On top of all of this, the Court notes that the explanatory requirement, at least in this Circuit,

is fairly demanding: "When an ALJ violates the treating-source rule, '[w]e do not hesitate to

remand,' and 'we will continue remanding when we encounter opinions from ALJ[s] that do not

*comprehensively set forth* the reasons for the weight assigned to a treating physician's opinion.'"

*Sawdy v. Comm'r of Soc. Sec.*, 436 F. App'x 551, 553 (6th Cir. 2011) (emphasis added) (quoting

*Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009)); *see also Rogers*, 486 F.3d at 243 ("[A] failure

to follow the procedural requirement of identifying the reasons for discounting the opinions and for

*explaining precisely how those reasons affected the weight accorded the opinions* denotes a lack of

19

substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." (emphasis added)).

In short, it appears that the ALJ did not fully consider the treating-source weighting factors listed in 20 C.F.R. § 404.1527(c).  It is thus not presently clear that substantial evidence supports assigning Dr. Grias' opinion "limited" weight.  Accordingly, this Court recommends remand.  *See Sawdy*, 436 F. App'x at 553; *Rogers*, 486 F.3d at 243.

Lastly, the Court need not now address Plaintiff's other claim of error.  Plaintiff argues, albeit briefly, that the ALJ erred in assessing his credibility.  (*See* Pl.'s Mot. Summ. J. at 12-14.) But given that, on remand, the ALJ may further credit Dr. Grias' opinion, and that Dr. Grias' opinion supports Plaintiff's testimony about the limiting effects of his back and lower-extremity pain, it may be that the ALJ will further credit Plaintiff's testimony on remand.  As such, this Court recommends denying Plaintiff's second claim of error as moot.

## V.  CONCLUSION AND RECOMMENDATION

For the reasons set forth above, this Court finds that the Administrative Law Judge did not fully comply with the explanatory requirement of the treating-physician rule.  The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 9) be GRANTED IN PART, that Defendant's Motion for Summary Judgment (Dkt. 14) be DENIED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REMANDED.

On remand, the ALJ should show that he fully considered each of the factors set forth in 20 C.F.R. § 404.1527(c) in evaluating Dr. Grias' opinion.  If necessary, the ALJ should reevaluate Plaintiff's credibility, modify Plaintiff's RFC, and obtain additional vocational expert testimony.

## VI.  FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.  *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97.  Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office.  *See* E.D. Mich. LR 5.1.  A copy of any objections is to be served upon this magistrate judge but this does not constitute filing.  *See* E.D. Mich. LR 72.1(d)(2).  Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response.  E.D. Mich. LR 72.1(d)(3), (4).

s/Laurie J. Michelson_____
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated:  April 16, 2013

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on April 16, 2013.

s/Jane Johnson_____
Deputy Clerk

21